### STATE of Missouri, Respondent,

v.

### Juan PAYNE, Defendant–Appellant

No. 71095.

Missouri Court of Appeals,
Eastern District,
Division Five.

Oct. 14, 1997.

Motion for Rehearing and/or Transfer to Supreme Court Denied Nov. 24, 1997.

Motion for Transfer to Supreme Court Denied Jan. 15, 1998.

562

John F. Garvey, St.Louis, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Lisa A. Fischer, Asst. Atty. Gen., Jefferson City, for respondent.

CHARLES B. BLACKMAR, Senior Judge.

Following retrial a jury found the defendant guilty of murder in the second degree, Sec. 565.020.1 R.S. Mo.1994 and of armed criminal action, Sec. 571.015, R.S. Mo.1994. The court followed the jury's recommendation in assessing concurrent life sentences on each count. We affirm.

The defendant does not challenge the sufficiency of the evidence to support the verdict, and so a relatively brief statement of facts will suffice. Gerald Akins, the victim's companion, was the only eyewitness, and there are few items of circumstantial evidence. Akins and Arlee Jones, the victim, were walking about midnight of July 10, 1993 in the vicinity of Ridge and Union in the West End of St. Louis. Jones was "high," and postmortem examination showed that he had recently used alcohol, cocaine and heroin. Akins testified that he had not been drinking or using drugs.

At the intersection of Ridge and Union they saw two men on the other side of the street who approached them with drawn guns. The defendant said to the victim, "you're the one," and the victim replied "I'm not the one." After more conversation along these lines the defendant shot the victim several times. Akins understandably retreated from the scene as quickly as possible and returned to his home. The victim was dead on arrival at a hospital. Akins had no phone and did not call the police until the following morning, from a phone booth. A policeman picked him up and drove him

downtown to the homicide bureau, where he was questioned initially by Detective Timothy Kaelin. The police report, to which Kaelin contributed, made no mention of any description given to Kaelin by Akins. Kaelin showed him some pictures of police characters, from which he could not make a definite identification, but he indicated that one 'looked like' the gunman. The pictures Kaelin showed him were not further identified and Kaelin took no part in the remaining investigation.

Akins was then questioned by other officers and a large number of pictures were shown him a day or two later. He pointed to a picture of the defendant, who was then arrested and placed in a lineup. Akins picked the defendant out of the lineup.

### The Absence of Detective Kaelin

The defendant strongly argues that the trial was tainted when counsel undertook to subpoena Kaelin and Kaelin did not appear. The uncontradicted record shows that the St. Louis Metropolitan Police Department discourages the service of subpoenas on officers on duty or at their homes. The liaison office undertakes to accept subpoenas served on it seven working days before the trial date.

The defendant announced on April 15, 1996 that he would be ready for trial on Monday, April 22. Also on April 15 defense counsel's investigator served a subpoena directed to Kaelin on the liaison office. The subpoena was returned to the server the following day, apparently because it had not been served seven *working* days before the trial date, and counsel was directed to serve the document at the Homicide Bureau, in which a secretary had authority to accept service for police officers in the bureau. The subpoena was served there on Wednesday, April 17, but the particular secretary who handled subpoenas was not present. Kaelin was on duty from Monday through Friday of that week, with a possible day off, and was scheduled to go on vacation after completing his shift on Friday, April 19. He left on vacation without knowing about the subpoena. Defense counsel made no check as to whether the subpoena had reached him and whether he would appear.

Trial commenced April 22. The initial trial was aborted on defendant's motion and a second trial began on Tuesday, April 23. At this time defense counsel noted Kaelin's absence and was advised that he was on vacation. Counsel filed oral and written motions for continuance, the latter being in proper statutory form. The court overruled the motions but requested the prosecution to try to get hold of Kaelin and expressed confidence that he would be present before the trial ended. The prosecutor's office made inquiry of the police department but the word did not get to Kaelin before the trial had ended. Although it was reported to the court that Kaelin could not be reached, Kaelin himself later testified that his whereabouts were known to the police department. The defense rested its case without calling any witnesses.

The defense focused on the unreliability of Akins's identification. The night was dark and Akins had a substantial criminal record. Counsel made much of the absence of any description of the suspect in the police report, along with some inconsistencies between testimony at the first and second trials. He also intimated that there was undue suggestiveness in the photos Kaelin showed Akins.

We do not commend the police department's handling of the subpoena, which suggests conscious unhelpfulness. The department had notice of the subpoena for a full working week while Kaelin was on duty. If the department wants to avoid personal service of subpoenas on officers wherever the process server can find them then it should facilitate the delivery of documents lodged with it. It may also be inferred that the department was less than helpful in responding to the prosecutor's request that Kaelin be located, made at the direction of the court. Later evidence showed that Kaelin was hunting in Callaway County, approximately two hours from St. Louis. He could have been in and out of court in one day, thus putting an end to any speculation about the effect of his testimony. The trial judge suggested that the entire procedure of appointing an agent to receive service of subpoenas is contrary to the legal requirement of personal service,

and lawyers may consider that personal service is necessary if the service on a designated agent may lead to a runaround. So long as the department maintains its policy, however, it should receive documents graciously and seek to assist counsel in exercising the right of compulsory process.

Any fault on the part of defense counsel is minimal. Counsel has the right to subpoena a witness whenever it is considered that the testimony may have value. The attorney general suggests that counsel was at fault in announcing ready for trial without making sure that Kaelin would be available, but at the time the announcement was made and at the time the subpoenas were served Kaelin was present for duty and, had he received the subpoena, he could have been compelled to attend.

We must still determine, however, whether Kaelin's absence was prejudicial to the defense. Rule 84.13(b) enjoins us to reverse only for "error ... materially affecting the merits of the action." See *State v. Fuller*, 837 S.W.2d 304, 307 (Mo.App.1992.) Determination of the possible effect of error, assuming that such there was, is an uncertain process. The trial judge is much better informed on the total trial setting than we can possibly be, and his judgment should be accorded respect. Against this must be balanced the right of a defendant to present testimony such as might seem helpful, and to be able to compel the attendance of witnesses.

In the present case, Kaelin testified in a lengthy deposition. The upshot of his testimony was that he had little memory of the particular incident, which had taken place nearly three years earlier. He apparently had not been interviewed in the meantime by any representative of the defense. Defense counsel sought to show that Akins had given him no description of the subject, thus casting doubt on his later identification. Kaelin testified to his usual practice of including in his preliminary report any description of a suspect given by an interviewee, and opined from the absence of the description that Akins had furnished none. Akins testified to giving a description of some of the gunman's features, but was not clear as to whether he had given it to Kaelin or to an officer who interviewed him later. Kaelin said that he had shown Akins some shots of police characters which he had in his desk, but had not kept them and did not know where they were, who the subjects were, or whether the defendant's picture was included. Akins was not certain that any of the pictures that Kaelin showed him were of the defendant, and picked the defendant out of a later showing.

We are unable to see from Kaelin's deposition how the information he gave would benefit the defendant substantially. His counsel could and did point out in argument the absence of any description from the police report as an indication that Akins was not sure whom he had seen. Kaelin's testimony showed nothing to indicate that his display of photos was "tainted," or that he tried to get Akins to identify the defendant. Akins seems to have made his initial identification from a photo shown him later, rather than from any Kaelin showed him.

The defendant argues that, at the very least, Kaelin was more available to the state than to him, and that his counsel could properly comment on this circumstance. Cases consistently hold that police officers are not inherently less available to the defense than to the prosecution. See *State v. Ganaway*, 556 S.W.2d 67 (Mo.App.1977.) They can be interviewed or deposed. Here the defense had many months during which Kaelin could have been interviewed. The law restricts the situations in which a party may introduce a phantom witness in argument and speculate about what that witness might have said. *Morrissey v. Morrissey*, 935 S.W.2d 715 (Mo. App.1997). The record indicates that Kaelin's whereabouts were not known to either the defense or the prosecution during the trial. We are unable to say that he became unavailable to the defense immediately before and during the trial, so as to permit the defense to speculate about his testimony.

Even though we criticize the police department for its handling of the subpoena directed to Kaelin, we are unable to say that his testimony would have helped the defendant to such an extent as to warrant a new trial. He offered nothing which was not

shown by other evidence, and counsel was able to make all indicated points in oral argument. Counsel specifically argued about the absence of a description. It is doubtful that Kaelin's evidence would have aided the defendant to any substantial degree. Point denied.

## The Batson Issue

The panel contained eight African–Americans out of a total of 25. The prosecution used all six of its peremptory challenges to remove African–Americans. The defense objected under the doctrine of *Batson v. Kentucky,* 476 U.S. 79, 89, 106 S.Ct. 1712, 1719, 90 L.Ed.2d 69 (1986). The trial judge found that the reasons assigned by the prosecution were race-neutral and not pretextual. The finding is amply supported.

 For four of the six, the prosecution assigned the circumstance of unemployment as justification for the challenge. This has been recognized consistently as an appropriate reason. *State v. Alexander,* 755 S.W.2d 397, 398 (Mo.App.1988) Another was challenged because the prosecutor thought he had a misdemeanor conviction. The defense argues that the prosecutor did not inquire into the nature of the conviction so as to make sure that his information was accurate, but the juror admitted to a "problem with the police." This would be an appropriate and neutral reason for a challenge. The sixth juror was challenged because the prosecutor thought that he did not have good understanding and because he had been arrested for peace disturbance. These reasons are also sufficient. The defense fails to demonstrate that other jurors with the qualifications the prosecution questioned were allowed to remain.

 The court is not required to probe reasons assigned for a challenge so as to determine whether the reasons are sound. The prosecution is entitled to play "hunches," so long as they are race-neutral and not pretextual. *State v. Parker,* 836 S.W.2d 930 (Mo.banc 1992.) When it is not shown that jurors with the same qualities as those who were challenged have been allowed to remain on the jury, the question of pretext must ordinarily be left to the trial court. Point denied.

## Bad Faith in Calling Witness

The prosecutor in opening statement indicated that there would be evidence that, after an altercation in 1991, "Arlee and Juan Payne were not friendly anymore ..."

The prosecution put on one witness who was asked about relations between the defendant and the victim but said that she had no information.

The state then called the victim's daughter, Antoinette Jones–Plumber. She had testified at a prior trial of the defendant for this offense, and the trial judge had granted a new trial because he considered that he had admitted inadmissible hearsay in response to questions about the victim's attitude toward the defendant. The prosecutor sought to question her about her observations of the relationship between the defendant and the victim but was quickly stopped by objections and abandoned the inquiry.

The defendant argues that the prosecutor was acting in bad faith in calling Jones–Plumber, knowing that no admissible questions could be asked of her. In the motion for new trial he introduced testimony of Jones–Plumber indicating that she knew nothing about the relationship between her father and the defendant except for what her father had told her. He argues that the prosecutor was trying to suggest inadmissible matter in the form of questions, which drew proper objections.

We reject the challenge. The jury was properly instructed that what is said in opening statement is not evidence, that questions are not evidence, and that jurors are to give *no consideration at all to a question as to which an objection was sustained.*

It would have been appropriate for the defense to point out in argument that the prosecutor had failed to back up the assertions in his opening statement. Such argument is often used. Whether to use it in a particular case is a matter of trial tactics.

 As to the matter of the prosecutor's good faith, we see nothing which indicates

that the finding of the trial judge is not correct. There are indications that the prosecutor's problem was caused by failure to interview the witnesses before trial rather than by some devious strategy of misusing questions.

We find no legal error. The judgment is affirmed.

CRAHAN, C.J., and CRANE, J., concur.